## In re Oliver G. KOHLMEYER.

### No. 47050.

Supreme Court of Missouri,

En Banc.

Sept. 14, 1959.

Walter M. Clark, St. Louis, Special Counsel for Informants.

No appearance for Kohlmeyer.

EAGER, Judge.

By leave of court the present information was filed here by the members of the Bar Committee of the Eighth Judicial Circuit. The information charged Respondent, Oliver G. Kohlmeyer, with professional misconduct in that he had, as attorney for the Administrator of the Estate of James Otis Riggins, misappropriated and converted to his own use the sum of $6,343.90 of the funds of that estate. The prayer of the information was that respondent be permanently disbarred. Citation was issued and respondent filed his answer; the answer is somewhat ambiguous, but it may be considered as constituting a denial of professional misconduct, of the misappropriation of funds, and of any willful failure to pay them over.

The Bar Committee held its informal investigatory hearing under Rule 5.03, Supreme Court Rules, 42 V.A.M.S. on April 24, 1958, heard evidence, and found that there was reasonable cause to believe that respondent was guilty of unprofessional conduct. On May 22, 1958, and upon due notice, it conducted a formal hearing at which respondent was present; it then found that there was probable cause to believe respondent guilty of professional misconduct. These proceedings followed. After the filing of respondent's answer the court appointed the Honorable Amandus Brackman as Special Commissioner with the usual powers and duties. After a full hearing before the Commissioner on Nov. 10, 1958, at which respondent was present, the Commissioner filed his "Report, Finding, Conclusions and Recommendations"

wherein he found respondent guilty as charged, with the minor exceptions noted later, and recommended disbarment. Such references to the report as are necessary will be made hereinafter.

Respondent was admitted to practice in 1922 and has presumably practiced since that time in the City of St. Louis. There is no dispute about the essential facts here; in fact, respondent admitted at the Commissioner's hearing the truth of the testimony of Joseph H. Riggins, from whom all the substantive facts came. We may thus state the facts rather briefly. Respondent was attorney for the Estate of James Otis Riggins, of which a brother was the original administrator. That brother was accidentally killed and respondent suggested the appointment of Joseph H. Riggins, another brother, as administrator de bonis non. That suggestion was accepted and the appointment was made. The total assets were approximately $13,000, and the heirs consisted of seven brothers, the children of a deceased brother, and the children of a deceased sister. Two of these children were minors; one brother was an incompetent committed to a State Hospital, and a guardian had been appointed for him.

On July 19, July 25, Aug. 29 and Dec. 14, 1957, respondent caused the Administrator D.B.N. to issue checks, payable to his (Kohlmeyer's) order for $950, $3,600, $600, and $403.90, respectively; these checks were made payable to respondent at his own suggestion. All of these checks were endorsed by respondent and were paid on or very shortly after their respective dates; we may say that they were cashed by him, though the precise mode of payment is not shown. We need not relate the specific conversation between the Administrator and the respondent at the writing of each check; respondent did, however, in each and every such instance, tell the Administrator that the money was to be used for a distribution; in one instance, supposedly to the guardian of the incompetent brother, in another to pay off "minor heirs and some heirs * * * out of the state," in another to make a partial payment to certain remaining heirs, and in the other for "some of the heirs." None of the proceeds reached any of the heirs. It is clear that Joseph H. Riggins, having no legal training or experience whatever, relied entirely upon Kohlmeyer in issuing these checks for the asserted purposes. Joseph testified that he did know that he was responsible for the assets of the estate. The heirs soon began to make inquiries and complaints; over a period of about three months Joseph talked with respondent several times about the money and what had been done with it, and he asked respondent to "put it back in the bank where it belonged." With reference to one check respondent first said that he had sent a check to the guardian of the incompetent heir, but later admitted that he had kept the money; with reference to another check he said that the money was "out at Pacific, Missouri"; at another time he told Joseph that he had paid the heirs in Colorado but that they had not "signed the release." Finally, he agreed to restore all of the money and, directly or indirectly, admitted the entire misappropriation. Getting no concrete satisfaction, Joseph complained to an agency of the St. Louis Bar Association. After the making of that complaint and about Feb. 20, 1958, respondent gave Joseph his personal check for $5,150 drawn on the Bank of Gray Summit, Missouri, postdated to Feb. 24, 1958. On its date Joseph presented this check at the bank in person (and again two weeks later), but found that respondent had no account there. Certain conversations with respondent followed but with no tangible results. On the date of the formal hearing before the Bar Committee respondent refunded to the Administrator the sum of $5,150 by means of a cashier's check, and at the hearing before the Commissioner he refunded an additional $1,103.50 in the same manner. These refunds included the amounts of all four of the checks previously described, plus a sum of $700 received by respondent as the proceeds of the sale of the decedent's car, which will be mentioned later.

At the formal hearing before the Bar Committee respondent had been advised that he should consult a lawyer; at the hearing before the Commissioner this matter was again called to his attention. Counsel for the Committee stated that under the Rules counsel might be appointed for him if he so desired; respondent expressed his understanding but requested no action, and he continued without counsel. The record shows that he has been afforded every reasonable consideration. At the hearing before the Commissioner respondent cross-examined Joseph Riggins very briefly, but he offered no evidence. A separate charge of the misappropriation of the proceeds of a $90 check was there stricken at the request of the Committee, it having then determined that the proceeds had been properly used for a bond premium. Respondent's sole defense to the charges of misappropriation previously detailed appears to be that he had made full restitution. He did not testify, but he made certain brief statements; one of these was that he did not use the money for himself—"No, not for myself, but I used it," and that he used it for purposes other than those for which it was received. At the formal hearing before the Committee respondent stated rather vaguely that he had invested the proceeds of the checks in, or had loaned them upon the security of, certain deeds of trust; that is relatively immaterial. Upon these facts the Commissioner found respondent guilty of professional misconduct; we agree with this conclusion. Counsel for Informants make the points here that respondent is unfit: (1) because he converted and misappropriated his client's funds; (2) because he was guilty of embezzlement or stealing, a felony; (3) because he made false and fraudulent representations to his client; and (4) that restitution does not mitigate the offenses. The case may be decided on (1) and (4), and indirectly upon (3) as incorporated into (1).

█ It stands admitted that respondent converted and used funds of his client which he obtained through his client's confidence in him as a lawyer. The exact use which he made of the funds is immaterial. His act was dishonest by any standard, lay or professional. Specifically, respondent violated Rules 4.11, 4.47, 4.29, constituting parts of the Canon of Ethics. We need not determine here whether the misappropriation was technically a felony under Section 560.156, Mo.Cum.Supp., 1957 V.A.M.S. ("Stealing," including former crime of Embezzlement—State v. Waters, Mo., 302 S.W.2d 34) for: " * * * 'The law requires that a lawyer shall maintain a higher moral standard than simply to avoid conviction of embezzlement or larceny. His clients are entitled to rely on his honesty and on his devotion to their interests.'" State Bar Committee v. Stumbaugh, Mo., 123 S.W.2d 51, loc. cit. 53.

The actions of respondent, repetitious as they were, carry a fair inference that his representations to his client of the proposed payments to the heirs were made with a present intent to deceive, but it is unnecessary to decide that as an isolated point. He certainly made false representations after he received the checks. The basic charges here are that he imposed upon the confidence reposed in him by his client, and converted and appropriated the funds of the estate to his own use. Those things he did; and those acts establish unprofessional conduct beyond all question. In re Conner, Banc, 357 Mo. 270, 207 S.W.2d 492; State Bar Committee v. Stumbaugh, Mo., 123 S.W.2d 51; In re German, 348 Mo. 859, 156 S.W.2d 678; In re Downs, Mo.App., 255 S.W.2d 834.

Respondent was also charged with the misappropriation of an additional sum of $700 received by him from the original Administrator as the proceeds of the sale of decedent's car. There is a rather vague claim in the record that the Administrator agreed that respondent might keep that money to apply on his fee, although no order of allowance was shown (and if indeed any fee might be claimed under these circumstances). This charge has become wholly superfluous in view of our other

rulings, and we find respondent not guilty of it, as did the Commissioner.

It is well established that the making of restitution is no defense to such charges as these. Stumbaugh, Conner, Downs, supra. In Conner, supra, it was said, 207 S.W.2d, loc. cit. 500, that restitution " * * * does not deprive the public of its right to be protected against an unsafe member of a privileged class. Nor does it deprive the courts of their right to have attorney officers who are conscious of their high duty to the public, to the courts and to their profession. If a professional man offers to do the right thing merely because he might be degraded and disbarred if he failed to, he has ceased to act uprightly. When attorneys take their oaths as court officers they pledge themselves to something far above the honesty of compulsion."

If we permitted such a defense we should rewrite the Canon of Ethics. A restitution does not automatically make one fit, who has already proven himself unfit. Such charges are not instigated and prosecuted to collect a debt, but to protect the public, the bar, and the courts.

Respondent stated that he had been very seriously injured in an accident some 8–10 years ago, with lasting effects; undoubtedly that is true. As the issues are made here, however, we do not see how this can be determinative or even persuasive on any question before us, for as the Commissioner stated: "There was no indication that his unfortunate experience rendered him incapable of practicing law or prevented him from fully understanding the nature and consequences of his unlawful acts."

Such duties as we have here are never pleasant, nor are those of our dedicated Bar Committees; but the course here is clear. For the professional misconduct found, Oliver G. Kohlmeyer is hereby disbarred from the practice of law, and his name will be stricken from the roll of attorneys. It is so ordered.

All concur.